IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

RANDALL HOLLIS & STEVEN EBERLINE
on behalf of themselves and all other similarly
situated employees,

    Plaintiffs,

v.                                    No. 1:13-cv-01077-JDB-egb

DUMP CABLE, INC. &
RAGHID BAKER ARDAHJI,

    Defendants.

---

ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND
HOLDING IN ABEYANCE THE MATTER OF DEFENDANT, ARDAHJI'S PERSONAL
LIABILITY UNTIL THE AUTOMATIC BANKRUPTCY STAY HAS BEEN LIFTED

---

On March 1, 2013, Plaintiffs, Randall Hollis and Steven Eberline, initiated this action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (the "FLSA"), on behalf of themselves and similarly situated employees who were allegedly denied overtime compensation by the Defendants, Dump Cable, Inc. and Raghid Baker Ardahji. Before the Court is the Plaintiffs' motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on three issues: (1) whether they were properly classified as independent contractors not covered by the FLSA's overtime provisions; (2) whether Ardahji can be held individually liable as an "employer" within the meaning of 29 U.S.C. § 203(d); and (3) whether, as a matter of law, the Plaintiffs are entitled to recover liquidated damages under 29 U.S.C. § 216(b) if and to the extent the Defendants are found to be in violation of the Act. (D.E. 52.) Defendants have filed a response. (D.E. 65.)

## I. FACTUAL BACKGROUND[1]

Dump Cable, Inc. ("Dump Cable" or "the Company") is a Tennessee corporation that sells, installs, and repairs Dish Network satellite television services in Tennessee, northern Georgia, northern Mississippi, and eastern Arkansas. (Pls.' Stmt. of Material Facts ¶¶ 2–6, D.E. 52-1.) Ardahji, as sole shareholder and Chief Marketing Officer of Dump Cable, is ultimately responsible for all decisions made within the Company. (Id. ¶¶ 3–4.) Eighty-five percent of Dump Cable's revenue is derived from residential Dish Network installation, repair, and upgrade work, for which it is paid either directly by Dish Network or through a regional service provider, depending on the geographic region. (Id. ¶¶ 6–7.) For the past five years, this work has been Dump Cable's core business, but during that time the Company has also engaged to a lesser extent in the retail sale of remote controls, home theater systems, surge protectors, wiring and accessories, and "direct sales" of DirecTV, another satellite provider. (Id. ¶¶ 5, 7.)

---

[1] Unless otherwise indicated, the facts herein are taken from the complaint (D.E. 1), Plaintiffs' Statement of Undisputed Material Facts (D.E. 52-1), the Defendants' response thereto (D.E. 65-2), and related exhibits. Defendants have submitted their own "Statement of Material Facts" for the Court to consider in deciding this motion. (See D.E. 65-2 at 7–8.) However, due to noncompliance with the Local Rules, the Court has disregarded all five paragraphs of the Defendants' statement of material facts as well as all or part of paragraphs 10–11, 16, 18, 20, 22, 24, 26–28, 31–32, and 38 of Defendants' responses to the Plaintiffs' statement of undisputed material facts. Local Rule 56.1(b), which allows a nonmoving party to file a "statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried," requires that "each . . . disputed fact" be accompanied by "citations to the record supporting the contention that such fact is in dispute." L.R. 56.1(b), Local Rules of the U.S. Dist. Ct. for the W. Dist. of Tenn. Similarly, the nonmovant's response to the moving party's statement of undisputed material facts, to the extent it seeks to demonstrate that any fact is disputed, "must be supported by specific citation to the record." Id. The citations provided in support of Defendants' statement of material facts and those contained within the above-named paragraphs of Defendants' response to Plaintiffs' statement of facts all refer to portions of Defendant, Ardahji's deposition that have not been submitted to the Court by either party. Because this testimony is not available for the Court's review, it cannot be used to support Defendants' contentions.

Ardahji and Dump Cable cover all of the overhead expenses involved in operating the Company, including investment in Dish Network equipment, operation of the retail store, employment of office staff, and operation of a call center. (Id. ¶ 8.) Dump Cable provides its customers with a ninety-day warranty guaranteeing the quality of every installation or repair job, which work is performed exclusively by installers/technicians, such as Plaintiffs, who are hired by Dump Cable and classified as "independent contractors." (Id. ¶¶ 8–9.) The Company pays these installers on a "piece rate basis," i.e. a set rate for each job performed regardless of how long it takes to complete and, as such, without relation to how many hours the installer works per week. (Id. ¶ 9.) Installers did not have the ability to negotiate their piece rates, and any increase was at the discretion of the Company. (Id. ¶ 24.)

Dump Cable did not *require* the installers it hired during the relevant time period to have any prior experience installing satellite television services, but its general advertisements soliciting new installers typically emphasized such experience was preferred. (Id. ¶ 10; Raghid Baker Ardahji Dep. 150:13–16, D.E. 52-3.) At his deposition, Ardahji conceded that the experience levels of the installers the Company hired "range[d] from the most seasoned [twenty]-year veteran all the way to people like [Plaintiff] Hollis who were willing to do their own training." (Ardahji Dep. 148:22–149:5, D.E. 52-3.)

Dump Cable did not provide any formal training to its installers, but before they were assigned their own jobs by the Company, the new hires participated in "ride alongs" with senior installers, during which they observed various installation jobs and service calls. (Pls.' Stmt. of Material Facts ¶ 11, D.E. 52-1.) After Eberline was hired by Dump Cable, he completed a three-day ride along with installer Jeff Laney. (Id.) Hollis, who had no prior installation experience when he joined the Company, accompanied installer Dale Oshbocker for two to three

days and Jeff Laney for approximately one and one-half weeks. (Id.) According to both Eberline and Hollis, these ride alongs constituted on-the-job "training." (Steven Andrew Eberline Dep. 23:9–13, D.E. 52-6.; Randall Hollis Dep. 30:20–25, D.E. 52-5.)

Since April or May 2011, Dump Cable has utilized an online system called ETA Direct to schedule and route installation and service jobs for its installers. (Pls.' Stmt. of Material Facts ¶ 13, D.E. 52-1.) Dish Network assigns jobs to Dump Cable, whose field service managers—independent contractors who perform installations and act as supervisors to installers/technicians—then assign the jobs to installers/technicians through ETA Direct. (Id. ¶¶ 12, 14.) Dish Network schedules jobs in two general time slots: "a.m." (between 8:00 a.m. and 12:00 p.m.) and "p.m." (from 12:00 p.m. to 5:00 p.m.). (Id. ¶ 15.) "A.m." jobs could only be performed in the morning, while jobs in the "p.m." time slot were to be completed in the afternoon. (Id.) Installers were not at liberty to reorganize the order of jobs within each time slot unless they first received permission from a supervisor and, through one of the Company's dispatchers, obtained the customer's consent. (Id.; Eberline Dep. 36: 7–18, D.E. 52-6.)

Typically, jobs were assigned within a seventy-five-mile radius of an installer's home, but at times field service managers assigned them outside that radius. (Pls.' Stmt. of Material Facts ¶ 17, D.E. 52-1.) Installers did not have the ability to refuse assignments or to choose which work orders they wanted to complete. (Id. ¶ 16.) If an installer turned down a job, he would not be routed to any future ones. (Id.)

Installers/technicians were prohibited from performing jobs for any other company while working for Dump Cable. (Id. ¶ 27.) Regardless, according to Eberline, he and other Dump Cable installers maintained full schedules with the Company and for that reason would not have had the time to perform jobs for another company. (Eberline Dep. 18:12–18, D.E. 52-6.) He

4

estimates that he regularly worked ten to thirteen hours per day, and he was consistently scheduled for jobs six days a week, Monday through Saturday. (Pls.' Stmt. of Material Facts ¶ 18, D.E. 52-1.) Hollis worked on average ten to twelve hours per day, fifty to sixty hours per week. (Id.) Installer Jeff Laney was assigned jobs six days per week. (Id.) If an installer desired to take a day off, he was required to provide two weeks' advance notice to his supervisor, who then had the discretion whether to grant the request. (Id. ¶ 19.)

Dump Cable had invested "hundreds of thousands" of dollars in Dish Network equipment, including products, receivers, dishes, and any Internet-related combining products, which it provided to its installers. (Id. ¶ 29.) The installers, however, were responsible for supplying their own tools and utilizing their own vehicles when performing jobs for the Company. (Id. ¶¶ 25, 30.) Dump Cable required installers to use only certain preapproved tools and parts. (Id. ¶ 30.) Dish Network and Dump Cable suggested that installers drive a white vehicle, on which they were required to place a magnet that read "Sharp Electronics[2], certified technician." (Id. ¶ 25.) Installers were required to wear a uniform consisting of a red "Sharp Electronics Dish Network" shirt, khaki pants, and, in the winter, a jacket with the Sharp Electronics logo. (Id. ¶ 26.)

Installers/technicians did not engage in any marketing or advertising on their own behalves and did not hold themselves out as independent installation companies. (Id. ¶ 31.) At all times, the installers represented Dump Cable. (Id.) They were not permitted to "upsell" customers for additional Dish Network services, nor to offer or provide services to customers in addition to the explicit specifications of the work order. (Id. ¶ 28.) Additionally, per company

---

[2] Sharp Electronics Satellite is the name of the business incorporated as Dump Cable, Inc. (Pls.' Stmt. of Material Facts ¶¶ 2–3, D.E. 52-1.)

5

policy, the installers could not charge for any custom labor performed on installation jobs. (Id.) They also were not allowed to hire help or assistance on jobs. (Id. ¶ 32.)

Dish Network employs a quality assurance inspector to examine installers' work. (Id. ¶ 22.) When installers failed the quality inspection for using nonapproved accessories or parts, Dump Cable issued them a financial penalty known as a "charge back." (Id.) The amount of a charge back had no relation to the damage caused by the installer's use of a nonapproved material. (Id.) When, as regularly happened, an installer contested a charge back, Ardahji would decide whether or not to reverse it. (Id.)

Furthermore, Ardahji had always himself maintained control over the quality of work the Company's installers performed. (Id. ¶ 20.) The Company provided its installers with a one-page, front and back, laminated "job aid," which set forth its proper installation procedures. (Id. ¶ 21.) Installers were required to follow Dump Cable's procedures, and if an installer were to deviate from these specifications, he would be issued a charge back. (Id. ¶ 23.)

Ardahji was the sole decision maker regarding whether to classify the installers as employees or independent contractors. (Id. ¶ 33.) He testified that he chose to classify installers/technicians as independent contractors because, in his experience, this was the standard practice across the industry. (Id. ¶ 34.) When he was starting the Company, Ardahji informed his accountant he would be treating his installers as independent contractors, and, in turn, she advised him to issue IRS 1099 forms to them. (Ardahji Dep. 92:19–93:7, D.E. 52-3.) He never sought specific legal or accounting advice as to whether he was complying with all federal wage and hour laws with respect to paying Dump Cable's installers. (Pls.' Stmt. of Material Facts ¶ 36, D.E. 52-1.)

Neither Ardahji nor Dump Cable ever recorded the actual time worked by installers/technicians, and although ETA Direct provided the routes for jobs, it did not track actual time spent driving to each particular location. (Id. ¶¶ 37–38.)

On a typical work day, installers would check around 6:45 a.m. the ETA Direct website, where the jobs for the installer's route for that day would be posted. (Id. ¶ 38.) Installers were required to be at their first job by 8:00 a.m. (Id.) A new install job could take between one and five hours, depending on the house's construction and wiring and whether the job was located in a rural area. (Id. ¶ 39.) "Trouble calls" required anywhere from forty-five minutes to a few hours, depending on the particular problem. (Id.) On upgrades, installers usually spent one to two hours per job, but, depending on the age of the home, the wiring, and the customer, these tasks could require up to five hours to complete. (Id.)

## II. STANDARD OF REVIEW

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1988). A dispute about a material fact is genuine only if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the moving party satisfies its initial burden, "the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." Slusher v. Carson, 540 F.3d, 449, 453 (6th Cir. 2008). In reviewing a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's

favor." Smith v. Perkins Bd. of Educ., 708 F.3d 821, 825 (6th Cir. 2013)(quoting Slusher, 540 F.3d at 453); *see* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Thus, summary judgment is warranted, following discovery and proper motion, against a party who fails to make a sufficient showing to demonstrate the existence of an element essential to her case and on which she will bear the burden at trial. Celotex, 477 U.S. at 322–23, 106 S. Ct. at 2552.

Conversely, "'where the moving party has the burden [of persuasion at trial]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" Epperson v. Res. Healthcare of Am., Inc., ___ F. App'x ___, 2014 WL 2056464, at *5 (6th Cir. May 20, 2014) (alteration omitted)(quoting Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986)). As the United States Supreme Court has stated, "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999).

### III. ANALYSIS

A.     Classification of Plaintiffs as Independent Contractors vs. Employees

In an action to recover unpaid overtime compensation under the FLSA, the plaintiff bears an initial burden to prove, *inter alia*, the existence of an employer-employee relationship. Kowalski v. Kowalski Heat Treating, Co., 920 F. Supp. 799, 806 (N.D. Ohio 1996); *accord* Benshoff v. City of Va. Beach, 180 F.3d 136, 140 (4th Cir. 1999). Plaintiffs seek partial summary judgment on that matter, arguing that, as a matter of law, they were incorrectly

8

classified as independent contractors and were instead employees of Dump Cable, entitled to overtime wages. (Mem. in Supp. of Pls.' Mot. for Summ. J. 3–12, D.E. 52-2.)

The FLSA defines the terms "employee" and "employ" in "exceedingly broad" terms. *See* Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295 (1985). Under the Act, an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The statute further provides that to "'[e]mploy' includes to suffer or permit to work." Id. § 203(g).

The existence or not of an employment relationship in any given case "is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes." Powell v. U.S. Cartridge Co., 339 U.S. 497, 528 (1950). "Rather, it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 523 (6th Cir. 2011)(quoting Alamo, 471 U.S. at 301), *reh'g & reh'g en banc denied* (July 6, 2011). "'The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.'" Id. (quoting Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984), *reh'g denied* (June 15, 1984)).

In determining whether an individual is an employee or an independent contractor, "courts have focused on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." Id. (citation and internal quotation marks omitted). The following six factors guide that inquiry: "1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; . . . 5) the degree of the

9

alleged employer's right to control the manner in which the work is performed;" and 6) "whether the service rendered is an integral part of the alleged employer's business." Donovan, 736 F.2d at 1117 & n.5. The Court will address each of these factors in turn, below.

   1. Permanency of the relationship

This first factor requires the Court to consider the substance and permanence of the working relationship between Dump Cable and the Plaintiffs. *See* Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 306 (4th Cir. 2006). "The more permanent the relationship" and the greater the exclusivity of the relationship, "the more likely the worker is to be an employee." Scruggs v. Skylink Ltd., No. 3:10-0789, 2011 WL 6026152, at *7 (S.D.W. Va. Dec. 2, 2011)(quoting Schultz, 466 F.3d at 306)(internal quotation marks omitted).

In this case, Plaintiffs were prohibited from performing jobs for any other installation company while working for Dump Cable. The routes they were assigned by the Company required full workdays, starting at 8:00 a.m. each morning, six days a week, to complete. This sort of exclusivity is indicative of the existence of an employer-employee relationship. *See* Parrilla v. Allcom Constr. & Installation Servs., LLC, No. 6:08-cv-1967-Orl-31GJK, 2009 WL 2868432, at *5 (M.D. Fla. Aug. 31, 2009)(finding a "high degree of permanence in Plaintiff's relationship with Defendant" where "Plaintiff was not permitted to provide cable installation services for any other cable installation company while [h]e worked for Defendant" and "was expected to show up at Defendant's office each morning, six days a week, and was given work orders that typically amounted to a full day's worth of work"); *cf.* Freund v. Hi-Tech Satellite, Inc., 185 F. App'x 782, 784 (11th Cir. 2006)(noting, with approval, that the district court had found that the working relationship was "not one with a significant degree of permanence"

10

because the plaintiff was free to perform jobs for other installation companies and could accept as few or as many jobs as he wished), *reh'g & reh'g en banc denied* (July 26, 2006).

Additionally, the contract entered into between Dump Cable and the installers provided that the Plaintiffs were hired for an indefinite period of time, with either party having the option to terminate "for any reason" upon thirty days' notice. (*See* Agreement ¶ 1, D.E. 52-4.) This, being "similar to an at-will employment arrangement," *see* Solis v. Cascom, Inc., No. 3:09-cv-257, 2011 WL 10501391, at *6 (S.D. Ohio Sept. 21, 2011), also points toward a finding that Plaintiffs were employees. *Cf.* Cascom, 2011 WL 10501391 at *6 (concluding that permanence factor weighed in favor of employee status where installers worked for an indefinite time period, until they quit or were terminated); Keeton v. Time Warner Cable, Inc., No. 2:09-CV-1085, 2011 WL 2618926, at *4 (S.D. Ohio July 1, 2011)(recognizing, as indicative of the existence of an employment relationship, the fact that "none of the Plaintiffs had a specified termination date when they would stop performing . . . installations" for the defendant-company). Given these facts, this factor strongly supports a finding that the installers were in an employment relationship with Dump Cable.

2. Degree of skill required

Under this factor, "[a] finding of unique or distinctive skills weighs in favor of independent contractor status." Keller v. Miri Microsystems, LLC, No. 12-15492, 2014 WL 1118446, at *6 (E.D. Mich. Mar. 20, 2014)(citation and internal quotation marks omitted). The skill required of the worker must be evaluated "with reference to the task being performed pursuant to the contract." Donovan, 736 F.2d at 1118. Some courts have found that the tasks performed by a cable or satellite installer require "specialized" or "technical" skill, akin to

carpentry or electrical work. *See, e.g.*, Keller, 2014 WL 1118446 at *6; Scruggs, 2011 WL 6026152 at *7.

Other courts, however, have concluded that where, as here, a company hires installers with no prior experience and allows them to learn the necessary skills in just a few weeks of on-the-job training, the skills involved must necessarily be fairly simple. *See* Cascom, 2011 WL 10501391 at *6 ("Several workers had no experience even remotely related to cable installation prior to beginning with [Defendant] . . . [T]he skills involved were simple enough to be learned by a few weeks of on-the-job training." (alteration in original)(citation and internal quotation marks omitted)); Parrilla, 2009 WL 2868432 at *5 ("Plaintiff's work did not require the application of particularly special, or difficult to acquire, skills" where the "skills could be acquired in as little as two weeks of on-the-job training" and "Defendant often assigned experienced technicians to work with new technicians for a one or two week period in order to get new technicians up to speed"); *cf.* Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1318 (11th Cir. 2013)("The meaningfulness of [plaintiffs'] skill as indicating that [they] were in business for themselves or economically independent . . . is undermined by the fact that [defendant] provided most technicians with their skills."). This Court agrees with the reasoning of these cases and concludes that Plaintiffs' dependence upon Dump Cable to equip them with the skills necessary for their jobs is incompatible with a position that the installers were in business for themselves. As such, this factor weighs in favor of finding that Plaintiffs were employees.

3. Worker's investment in equipment or materials

The Plaintiffs here were responsible for providing their own vehicles and tools for use in performing installation assignments, and they were required to procure their own liability, worker's compensation, and occupational disease insurance policies (*see* Agreement ¶ 11, D.E.

52-4.) These facts are "indicative of at least some 'economic independence.'" Bennett v. Unitek Global Servs., LLC, No. 10 C 4968, 2013 WL 4804841, at *9 (N.D. Ill. Sept. 9, 2013). However, the Plaintiffs' outlay was not a significant capital investment when considered in relation to the "hundreds of thousands" of dollars Defendant invested in the equipment necessary for installations. *Cf.* Cascom, 2011 WL 10501391 at *6 ("[I]nstallers' investment [in tools and use of personal vehicle to perform installations] was on the low end of what would be needed to start an independent business."); Parrilla, 2009 WL 2868432 at *4 (the plaintiff's "relative investment . . . was small" where the cost of tools that plaintiff provided, which were necessary to perform installations, was less than $1000 and, although plaintiff had to supply a vehicle, he used his own personal one; defendant "provided the actual cable, cable modems, digital video records, and other material inputs required for the installations"). The Court finds this factor to be neutral.

4. Worker's opportunity for profit or loss

"The extent to which an individual is able to 'generate more money based on skill and hard work' may tend to establish independent contractor status." Scruggs, 2011 WL 6026152 at *6 (quoting Herman v. Mid-Atl. Installation Servs., Inc., 164 F. Supp. 2d 667, 674 (D. Md. 2000), *aff'd sub nom* Chao v. Mid-Atl. Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001)). Plaintiffs' compensation system in this case is virtually identical to that in Parrilla v. Allcom Construction & Installation Services, LLC, No. 6:08-cv-1967-Orl-31GJK, 2009 WL 2868432 (M.D. Fl. Aug. 31, 2009), about which the court there stated:

> Because Plaintiff was paid on a piece work basis, Plaintiff's opportunity for profit or loss was, in a simplistic sense, a function of the number of jobs he could complete in a finite time frame. Excluding charge-backs, the more jobs Plaintiff could quickly complete, the more Plaintiff stood to profit.

> . . . Plaintiff's profit was also a function of the type of work orders that Defendant assigned him (and the amount of charge-backs Plaintiff received). Because the types of jobs that Plaintiff performed each paid differently, notwithstanding the amount of time it took to complete those jobs, Plaintiff would experience days that were more profitable than others simply as a result of the type of work orders that Defendant assigned to him. For example, assuming cable modem installations paid more than television installations, if all the work orders Plaintiff received on a given day were for cable modem installations, Plaintiff would make more on that day, *ceteris paribus*, than if he had been assigned all television installations. Of course, if cable modem installations took twice as long as television installations, it might be the case that Plaintiff could earn the same amount (or more) by just doing television installations throughout the day. Importantly, though, Plaintiff had no control over the types of work orders that he was given . . . .
>
> Furthermore, Plaintiff was not permitted to install cable services for other cable installation companies. Nor was he permitted to provide additional services for Bright House customers without first obtaining a new work order authorized by both Bright House and Defendant.
>
> No matter how quickly or efficiently Plaintiff worked, Defendant's charge-backs, [and] the manner in which it assigned jobs . . . obviated Plaintiff's ability to rely upon his own managerial skill.

Id. at *4 (footnote omitted). Here, too, "[P]laintiffs' opportunity for profit or loss depended more upon [Dump Cable's] provision of work orders and technicians' own technical skill and efficiency than their managerial skill." Scantland, 721 F.3d at 1316. As the Eleventh Circuit noted under similar facts in Scantland v. Jeffry Knight, Inc., 721 F. 3d 1308 (11th Cir. 2013),

> [a]n individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business. As the Supreme Court has explained, a job whose profits are based on efficiency is "more like piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor."

Id. at 1317 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).

As mentioned in Parrilla, Plaintiffs' ability to maximize their profits was undermined by the fact that Defendant could impose financial penalties against them in the form of charge backs. "This is particularly true" here since Dump Cable sometimes "deducted fees in excess of

14

the value of the jobs performed." Lang v. DirecTV, Inc., 801 F. Supp. 2d 532, 539 (E.D. La. 2011). The limited ability of the Plaintiffs to control their own profits or losses is indicative of economic *de*pendence. Accordingly, this factor weighs in favor of a finding that the installers were employees of the Company.

    5.  Degree of Defendant's right to control

Under the fifth factor, the Court looks at the nature of the parties' working relationship to determine whether the Defendant's degree of control over the "manner or method" of the putative employee's work performance "tends to indicate that the individual was an employee under the 'control' of the employer." Bennett, 2013 WL 4804841 at *6. In conducting this inquiry, courts have considered "whether workers may choose how much and when to work, . . . whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." Scruggs, 2011 WL 6026152 at *3 (alteration in original)(citation and internal quotation marks omitted).

There is no evidence to suggest in this case that Dump Cable monitored Plaintiffs' work performances particularly closely or that it micromanaged the details of how they performed their jobs. Even so, other facts point toward a finding that the Company exercised a significant degree of control over the Plaintiffs. The installers were not free to choose how many jobs to take on or when to perform them. If an installer wished to take a day off from work, he had to submit his request a considerable time in advance, and there was no guarantee it would be granted. Plaintiffs were not permitted to hire their own employees to help them complete jobs for the Company. Dump Cable prohibited the Plaintiffs, during their tenure, from accepting jobs from any other installation companies. Installers were required to wear Company uniforms and to advertise the Company's logo on their vehicles. If they used nonapproved tools on the job,

15

they were assessed a charge back penalty, which had no relation to any damage that might have been caused by their infraction.

These circumstances suggest that Plaintiffs were Dump Cable's employees. *Cf.* Cascom, 2011 WL 10501391 at *5 (determining that workers "were substantially controlled" where, *inter alia*, they could not hire their own helpers without special approval from the defendant; they were required to wear shirts with defendant's logo and to place the logo on their vehicles; they were deducted back charges for errors; and they were required to submit leave requests in writing); Lang, 801 F. Supp. 2d at 538 ("An arrangement in which defendants charged plaintiffs more than they earned for a particular job . . . undermine[s] plaintiffs' economic independence in a . . . serious way."); Keeton, 2011 WL 2618926 at *5–6 (finding the control factor weighed in favor of an employment relationship where plaintiffs had to wait for permission to take time off from work; they had no say in defendant's assignment of jobs to them; and they could not reorganize the order of jobs or trade jobs with other installers without permission from a supervisor); Parrilla, 2009 WL 2868432, at *2–3 (concluding that defendant "exerted significant control over" plaintiff where it controlled, *inter alia*, his daily work schedule, the type of work he performed, and the amount of time he could take off from work).  Thus, the fifth factor points toward a finding of an employment relationship.

6. Relationship between service rendered and Defendant's business

The final factor concerns "the extent to which the service rendered by the worker is an integral part of the putative employer's business." Schultz, 466 F.3d at 308. It is undisputed that the installation and repair work performed by the Plaintiffs in this case was the core of Defendant's business, constituting eighty-five percent of its profits. This factor weighs heavily in favor of employee status.

7. Weighing of the factors

This Court recognizes that opinions on this subject have gone both ways on the question of whether cable and satellite installers are independent contractors or "employees" under the FLSA. *See* Scruggs, 2011 WL 6026152 at *8 n.9 (collecting cases). However, on the facts presented by this case, where five of the six Donovan factors point toward a finding of an employment relationship, the Court concludes that, as a matter of law, Plaintiffs were Dump Cable's employees and were therefore protected by the overtime provisions of the FLSA. Accordingly, Plaintiffs' motion for partial summary judgment is GRANTED on this issue.

B.   Liability of Ardahji as "Employer"

Plaintiffs also ask the Court to find that, as a matter of law, Ardahji is chargeable with individual liability under the FLSA as their "employer." (Mem. in Supp. of Pls.' Mot. for Summ. J. 12–13, D.E. 52-2.) Ardahji insists, however, that because he has filed a notice of filing of bankruptcy (D.E. 55 at 3), the automatic-stay provisions of the Bankruptcy Code prevent the Court from rendering such a judgment against him at this time. (Defs.' Mem. in Opp'n to Mot. for Summ. J. 10, D.E. 65-1.) The Court agrees. The matter of Ardahji's personal liability as the installers' "employer" shall be HELD IN ABEYANCE until such time as the automatic stay has been lifted.

C.   Liquidated Damages

"An employer who violates the FLSA must pay the affected employee 'the amount of their unpaid minimum wages, or their unpaid overtime compensation ... and [ ] an additional equal amount as liquidated damages.'" Boaz v. FedEx Customer Info. Servs., Inc., 725 F.3d 603, 605 (6th Cir. 2013)(quoting 29 U.S.C. § 216(b)). These liquidated damages serve not as punishment but as compensation. Martin v. Ind. Mich. Power Co., 381 F.3d 574, 584 (6th Cir.

2004), *reh'g en banc denied* (Nov. 2, 2004). "Although liquidated damages are the norm and have even been referred to as 'mandatory,' . . . Congress has provided the courts with some discretion to limit or deny liquidated damages." Id. (internal quotation marks and citations omitted). Where the employer shows that it acted in good faith and that there were reasonable grounds for believing the classification was proper under the FLSA, the Court, in its discretion, may limit or deny liquidated damages. Id. (citing Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002)). However, "this burden on the employer is substantial." Id. (internal quotation marks, citation, and alteration omitted).

Plaintiffs insist that they are entitled to liquidated damages because Dump Cable cannot show that it made a good-faith inquiry into whether its actions violated the FLSA nor that there were objectively reasonable grounds for believing that the Company was in compliance with the Act. (Mem. in Supp. of Pls.' Mot. for Summ. J. 13–16, D.E. 52-2.) "In order to demonstrate good faith, . . . an employer 'must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions.'" Solis v. Min Fang Yang, 345 F. App'x 35, 39 (6th Cir. 2009)(quoting Martin, 381 F.3d at 584). Defendant has not made such a showing here. Although it contends that Ardahji consulted his accountant at the outset regarding the installers' classification, a review of Defendant's deposition testimony reveals that he independently made the decision to treat the installers as independent contractors *before* meeting with his accountant and that only upon learning that he had so classified them did she advise him to issue them 1099 forms. (*See* Ardahji Dep. 92:19–93:7, D.E. 52-3.)

As evidence of good faith, Defendant also points out that "[i]n all of Ardahji's prior experience, installers had always received the classification of 'independent contractors.'" (Defs.' Mem. in Opp'n to Mot. for Summ. J. 11, D.E. 65-1.) However, it is well established that

"simple conformity with industry-wide practice fails to demonstrate good faith under the FLSA." Reich v. S. New England Telecom. Corp., 121 F.3d 58, 71 (2d. Cir. 1997)(internal quotation marks and citation omitted); *see also* Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 910 (3d Cir. 1991)("good faith cannot be established merely by conforming with industry standards"), *cert. denied*, 112 S. Ct. 1473 (1992); Cascom, 2011 WL 10501391 at *7 (same).

Finally, the fact that Dump Cable was never audited by the government regarding nonpayment of overtime to its installers does not, as Defendant insists, indicate that the Company acted in good faith in failing to comply with the FLSA. Again, to meet the good-faith standard, Defendant must show that it took some *active* steps to ascertain its compliance (or not). It cannot merely rely on the inaction of the Department of Labor. Because Dump Cable has not put forth evidence demonstrating good faith under the FLSA, Plaintiffs' motion for partial summary judgment is GRANTED as against this Defendant on the matter of liquidated damages.

## IV. CONCLUSION

For the reasons set forth herein, the Plaintiffs' motion for partial summary judgment is GRANTED IN PART as to the issues of the installers' status as "employees" under the FLSA and their entitlement to liquidated damages as against the Company. As to the matter of Defendant, Ardahji's personal liability as an "employer" under the Act, the motion is HELD IN ABEYANCE IN PART until the automatic bankruptcy stay is lifted.

IT IS SO ORDERED this 23rd day of June, 2014.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE